You've got 15 minutes. Thank you, Your Honor. Good morning to the court. May it please the court, my name is Scott Davis and I represent the appellant Allen Rude in this claim. As you're aware, this is a denial of a long-term disability claim for Mr. Rude and although I think this case has been extensively briefed by the parties, it really is a pretty straightforward, simple case. The issue is did he receive a full and fair review and also were Aetna's denials of his claim reasonable? And I submit to the court that they were not reasonable and that he did not receive a full and fair review. Counsel, could I ask a couple basic questions? My understanding is that the first 18 months of long-term disability is judged against whether he could perform his existing job at Intel, is that right? That's correct. Okay, and then after that period of time that it changes to a more generalized look at the labor market? That's correct, Your Honor. Am I right that the first 12 months of short-term disability counts against the 18 months of long-term disability? That's correct. Okay, so for long-term disability there's a there's a six-month window assessed against or measured against whether he could perform his existing job at Intel and at that point it flips over to the longer and that's what's at issue today because he's already collected 12 months of short-term? Correct. Great, thank you. Yeah, so he, right, he just needed to be unable to do his prior occupation at Intel and then there's another six months that is that is the issue really today because even though it changed over to long-term disability from short-term disability there was still another six months where he needed to be just unable to do his prior job at Intel. Right, so for that six months if I could ask I guess now you've prompted one more question. For the first 12 months, I read it the same way, he just needed to be able to not form his existing job. For the next six months he also needed to not be able to perform his existing job, but for that next six months he's also got to meet this higher standard of what constitutes a disability requiring objective proof of it, right? That, yes. Okay. That is one thing that is different which is I've not seen the short-term disability plan because I didn't Mr. Nadel has said in his briefs apparently there is no objective medical finding requirement for the short-term plan. It looks like he needs needed a doctor's note or something, but not very much, but be that as it may it's not the standard that we're applying today for the next six month period, right? At least with the regard of the objective medical findings. Where I do feel that there is conflict and there's inconsistent decision-making is that that Intel and Aetna found him disabled and unable to do his job at Intel for the long-term disability plan. Suddenly the claim was was denied. Obviously based initially on the lack of objective medical findings. And there's two issues that I that I think are important in if I can address the issue with the heightened scrutiny. I've obviously submitted some evidence of conflict and evidence of bias in this claim. In the ERISA litigation world, as the court is very little or limited discovery that is allowed. And so I believe that even though there is no inherent structural conflict of interest in this case because Aetna made the decisions, I do think that Mr. Rood's evidence of a bias as it relates to one of the doctors. Which doctor are you referring to? This is Dr. Bowman, Your Honor. She was the, was that the internist? She was the internal medicine doctor, yes. And what's the evidence of bias as to her? The evidence to bias is that in discovery answers Aetna determined that she had, it's not so much the number of claims reviewed, she had reviewed 380 cases for Aetna in 2011. The larger issue is that about eighty percent of the time she found that the claimant was either not disabled or had no functional limitations. What is what is the usual rate? There's no usual rate. But then what's the significance of that number to me is that I think it it certainly should raise an eyebrow or raise skepticism. Why? I mean if if most doctors find people disabled fifty percent of the time and she's eighty-eight percent of the time, you know, I get the logic there. If we just know she's done it eighty-eight percent of the time without any other kind of reference, I don't understand its significance. Well it's again in in the significance to me is that I think it suggests a high number. And I don't, I don't, you know, we're not allowed to use expert testimony or expert evidence in in ERISA cases and so. Do I understand she found him not disabled from an internal medicine point of view? Did she find him disabled? She found him not disabled from an internal medicine point of view. Correct. Is there any disagreement about about that? I don't I don't necessarily have a disagreement with that. What I do think. Even if she's biased you don't really disagree with her conclusion, do you? No, what I think though is implausible and unreasonable about her opinion is that Mr. Root had an 80-pound weight gain due to an adverse reaction from Lyrica. So he had weighed approximately 330, 350 pounds throughout the time his claim was being adjudicated. And she did not feel that that warranted any type of limitation or any issue at all with regard to functionality. I think that's implausible. I think her ultimate opinion was implausible as well. She basically determined that Mr. Root could do very heavy work, which as defined by the Dictionary of Occupational Titles means lifting up to a hundred pounds for a third of an eight-hour day and frequently lifting 50 pounds, which is up to six hours out of an eight-hour day. I think regarding how often she sides with an insurance company or founds, I shouldn't say it that way, I should say that the percentage of time that she finds that a claimant is not disabled, to me, I think her opinions in this case are pretty telling. That at least should allow the court to raise some level of skepticism with regard to her opinions. One of the other doctors, Dr. Katz, the vascular surgeon, he actually found and said that due to this weight gain, and presumably this is an internal medicine issue, right, this is weight gain due to an adverse medication reaction, and Dr. Bowman didn't even address it in her report, but Dr. Katz, the vascular surgeon, although he said from a vascular standpoint Mr. Root is not limited, he also did comment on the fact that due to this weight gain, this 80-pound weight gain, he would have difficulty working. He would have difficulty working. I'm sorry, Your Honor. And it would contribute to his musculoskeletal issues and his chronic pain issues. What I think is telling in terms of Aetna's denial, their final denial, is that they referenced Dr. Katz's opinion about the weight gain, but didn't say anything about the difficulty that he would have working, and instead selectively reviewed the part where he said that he could go work from a vascular standpoint. Again, to me, that is, I think that's an unreasonable read of Dr. Katz's opinion and what he said in the case. Counsel, could I ask a couple more questions to make sure I understand the record correctly? The opposing counsel is going to get up in a minute and say that your client didn't offer evidence of the Social Security disability finding that he obtained. What is your response to that? Did he offer it? Yes, Your Honor. So on that issue, I think it's important to note that Intel and basically instructed Mr. Rude to file a Social Security claim earlier in the process, and in fact referred him to an organization for representation. The timing on this is somewhat unfortunate. Mr. Rude was approved by Social Security, which means, by the way, that they found he was unable to do any job, not only his prior job, but any job, day in and day out. And that decision came out on January 27th. Aetna's denial was on February 3rd, a number of days later. Did they have it? They did have it. Well, it's in the administrative record, and I faxed it to Aetna on February 3rd. So they had it at 1 in the afternoon, my time. Did they have a procedure for, you know, reopening or reconsidering? They didn't, Your Honor, and that's another thing that troubles me about the decision-making, is that I did not, my office did not receive Aetna's denial until two weeks later, until February 17th, although it was dated February 3rd. And there's really never been any explanation for why it was received two weeks later. To me, maybe I'm too skeptical, but it suggests to me that maybe the decision wasn't actually finished on February 3rd. It might have been finished at a later date and mailed. What is the significance of the Social Security decision anyway? Well, the plan, I mean, they have different standards, don't they? Yeah, they do, Your Honor. They have an objective medical findings requirement, but I think the significance of the Social Security decision is that in its final denial, when Aetna determined that Mr. Ruud's claim that certain of his diagnoses were documented with objective medical findings, at that point, I think the analysis was Mr. Ruud's functionality. In other words, he had gotten past the objective medical findings requirement, and now the issue was, okay, was he able to do his past job at Intel? That's where I think the Social Security decision is relevant, because... Well, for the first six months, the question was, was he able to do his past job at Intel? Correct, Your Honor. Yes, that's correct. That's the significance of the Social Security finding. Of course, we agree with you that they should take that into account. Where do we go from there? Well, then, what you, if that, if they should take that, they didn't take it into account, I think, at least Aetna did not. Intel did, in their quality review. They reviewed the Social Security decision. They had him sign a release so they can get information on the Social Security claim. There's no question that Intel, in their quality review, clearly reviewed the Social Security claim, and then they really dismissed it in one sentence, based on that the terms were different than the Social Security requirements. The quality review doesn't really review the substance of the decision, though. Is that right? They don't, Your Honor, but this is some evidence of conflict. In other words, Intel looked at the decision and made a decision. When they decided that Aetna's review was appropriate and it was reasonable and consistent with the plan, they made a decision, because at that point, Intel could have referred, they didn't need to change the decision. They were not... The answer to Judge Silverman's question, yes. What they're doing, essentially, is a review to make sure that the hoops were jumped through, the rules were followed, so on and so forth. So it's more of a merits, if you will, sort of a procedural decision rather than a merits review. Correct. Isn't that fair? I agree with that, and I think from a procedural standpoint, to answer your question, Your Honor, initially, about what do we do if they should consider it, well then, you would want to remain the case back to Aetna or... To reconsider the denial in light of the Social Security decision. Yes, and maybe the other evidence. I mean, there's a number of other procedural violations that I've identified in my briefs, but I'm running short on time now. I'd like to save some time for rebuttal, but I think the remand would be a full review of the claim again, not just of the Social Security decision, because there's a number of... I mean, I'm trying to figure out how we craft the order. What do we say? Go back and consider the Social Security, and what else? All of the evidence that was submitted, along with any new evidence that he may wish to submit. Okay, thank you, Mr. Chief. Thank you. You've got about three minutes left on rebuttal. Good morning. Morning, Your Honors. I was expecting three. That's a little odd. May it please the Court, my name is Darren Nadel from Littler Mendelson in Denver, Colorado, here on behalf of Intel Corporation. I also wanted to introduce briefly Catherine Kettler, who's here from the Intel Law Department. The standard of review, obviously, is a very important facet of ERISA cases, because this is not the normal form of summary judgment review that is submitted. The district court unusually sits as an appellate body itself and reviews the evidence of the plan administrator's determination on an abusive discretion standard. And then the question becomes, well, do you have to be skeptical about that in any way? And clearly, if this were a jury decision, instead of a decision by Aetna's appellate department, and it's definitely not a jury decision, I'm not suggesting that it is, but if it were a opinion of Dr. Marion, who says, I've looked at the MRIs and I've looked at the x-rays and I'm not seeing anything here. You'd also have the opinion of Dr. Diener, who was one of the treating physicians. Counsel, can I interrupt? Is a fair summary, why isn't it a fair summary? That at first they said there wasn't objective medical evidence, and then they said, okay, there is objective medical evidence, but it doesn't really rise to the level, essentially, where we would expect that it would influence, impact Mr. Root's ability to function to the extent that he can't do his job. I think that's almost a fair summary. Okay. I think at the first denial phase, which is not reviewed. It doesn't really matter, because it's not the final review stage, right? It's not the final review stage, but in all fairness, the Ninth Circuit does say if there are glaring inconsistencies between the review at the initial stage and the review at the appellate stage, that ought to make us all suspicious. So, for example, in the Honda Motors case, the type of differences were glaring, right? You had a denial initially based on the fact that there was no weight gain, and in fact, I'm sorry, no weight loss. And in fact, there was a 14% loss of weight that the person had experienced in that case. And you could see that right in the medical charts. And then they do an appellate review, and the appellate review completely shirks the question of whether or not there's weight loss, whether or not there's evidence of cancer or HIV. Those are massive glaring differences. There's a tremendous amount of consistency between the denial at the first stage and the denial at the second stage. Namely, the denier, Aetna, first through its clinical reviewer and then second through its appellate body, looked at the MRIs and looked at the X-rays and looked at the opinion of two of the medical examiners. We're favoring that evidence because that is the type of evidence that meets the definition of objective medical findings in the plan. And so, whether it was at the first stage or the second stage, it was still the X-rays and the MRIs. It was the radiology that controlled. Right. So, can I ask a couple questions? Absolutely. What did Mr. Rude's supervisor say about the travel that he had to do? He said four to eight times per year. But did he say international travel? I'm not sure that he said international travel. One or two times per quarter. So, that's four to eight times per year. But didn't he say international travel? And how is that consistent with brief travel? I didn't understand that. And I'm just going to try to find the page for you in the record where this occurs. I believe it's at page 170. Thank you. Sorry, that's a different point. Sorry, because I want to get you to the right point. If you look at both appellant's brief on page 13 and page 172 of the record, you'll see a report by Dr. – you'll see notes from Dr. Fanto where Dr. Fanto says that he travels frequently, but then he specifically says this report was in May 2009. He specifically says the last trip was in December of 2008. So, the only thing we know for sure – But my question is different, counsel. His supervisor was asked, what's this guy's current job require? And I think he said one or two times a year. My question is just, was it international travel? And how is that consistent with brief travel? I think he said four to eight times per year. Okay, but that's one or two times per quarter. Be that as it may, I'm trying to get at whether it was international travel. I don't believe there's anything in the record about whether the supervisor specifically said the word international or not. Okay. So, that's an answer to my question, and I appreciate that. How did Aetna decide what standard to use to decide whether this was a sedentary position, please? So, it relied largely on the Department of Labor's Dictionary of Occupational Titles. It put that together with the fact that his supervisor, in a form that's at page 288 in the record, said that his job is largely to provide customer support for IT projects, recognizing that that involved sometimes walking from one place to another to provide the support to different people. Does the plan say we're going to use this definition for sedentary or that definition for sedentary? The plan does not. What the plan does say about this, to avoid specifically the type of expert testimony that the claimant tried to provide here, is the definition of objective medical findings specifically excludes studies of the labor market and the like. Here's my problem. I'm looking at the six-month period of time when he was his current job, and I think, unless I'm misreading the record, and if I am, by all means, the whole point is I want you to tell me what I'm missing, truly. His current supervisor, I think, said pretty clearly, we've got this testimony about the one or two hours of walking and the hour of standing each day, and I think the Dictionary of Occupational Titles says that sedentary equates to sitting most of the time, walking or standing for brief periods of time, and retired only occasionally. So, again, I think the game changes when we're talking after 18 months, but how is his expert's description of his job duties consistent with this definition from the Dictionary of Occupational Titles? I don't know that there's a big difference between the two. So, for example, you can see from page, what you could see from page 170 of the record, which is the page I misquoted earlier, was that Aetna assumed that he sits for six hours, walks for one hour, stands for half an hour, and climbs stairs for half an hour. And we also know that from Dr. Agnew's report at page 438 of the record, Dr. Agnew, the orthopedic surgeon, found, based on reviewing the MRIs and the X-rays, that he'd be able to stand for three or four hours and walk for three or four hours, which, no matter what word you ascribe to the type of job, whether you call it sedentary or light sedentary, I think the key to all this is that the reports of Dr. Agnew and Dr. Marion found that he could stand and walk for far in excess of what anybody says was required of that job. Let me ask you about the Social Security finding. If I may, one last comment on the last point, Your Honor. I also wanted to mention, page 397 of the record, Mr. Rood's treating physician, Dr. Giener, had stated that he could walk with a normal gait. That was his own physician's findings. And that was in February of 2010. You may recall in the briefing, there's a question about, you know, he claims that, well, I don't feel the pain when I'm sitting, so an MRI may not show that. In February 2010, and you can see this at page 397 of the record, Dr. Giener ordered a second MRI, which was a standing MRI. And again, you can see that at page 397 of the record. And then you'll see that in Dr. Marion's report and Dr. Agnew's report, and I believe these are at pages 443 and 438 of the record, they both analyzed that standing MRI and find no incapacity. So with that, I apologize, and I'll take whatever question you have. Should Aetna have considered the Social Security finding if it had received it in time? No, I don't think it should have. Totally irrelevant? Has no relevance whatsoever? This court has actually ruled about Intel's plan in HAMA versus Intel court. It's an unpublished decision at 377, Fed Appendix 674 in 2010, that even when Intel had the Social Security Administration's determination in front of it, it need not consider it because of the grave differences between the standards that apply in the Intel plan and before Social Security. Which case is it? It's HAMA, H-A-M-M-A, v. Intel Corp., 377, Federal Appendix 674, out of this circuit in 2010. The full decision below is at 642, F sub 2nd, 1144, and the jump site to that part of the case is at page 1152. And there the, what happened with the Social Security report? There, unlike this case where Intel never, didn't receive the Social Security report before, I'm sorry. Maybe they did, maybe they didn't, that's not clear. The record's pretty unclear about that, counsel. I, the IQAR found that Intel had not received the report at the time. Okay, that's hardly an objective, then you're getting to a different problem, but okay. We've got the dates, that's what we're looking at is the dates, counsel, and there's no explanation for the dates. Unless you want to tell us. The dates are identical, right? Intel issues an opinion, it's a, it's a decision on February 3rd, and counsel sends it in on February 3rd. Well, that's what I said, it's, we can't tell whether they had it and ignored it or ruled and then got it, right? We can't really tell. Well, although we do know that the IQAR investigated that and found otherwise, but that's, that's of limited value. So anyway, what, what are the facts in HAMA? I'm sorry? What were the facts in the HAMA case that you just told us about? In the HAMA case, the appellate reviewer did have the social security determination, and this court found that it was under no obligation to consider the social security determination because of the, of the differences specifically between Intel's standard, namely the objective medical finding standard, and the social security administration standard, which looks at virtually any medical evidence at all. Okay. Where I began, and if I can just sum up quickly, because I don't need to use all of my time, I don't feel a need to do that, but if this were a jury trial, and it's not, but there is a finding, a finding of fact below, it is being reviewed on an abuse of discretion standard, and so typically when you have conflicting evidence in the record, the appellate court's job is to see whether or not there's enough evidence to support the jury's finding, and that's it. And if it does, then that's the end of the question. So here, it's almost like that, but it's clearly not like that, because it's not a jury that makes this decision, it is an insurance company, and there's not testimony in court, instead there is expert testimony that's submitted only in writing, and so the question on the table is always, is there some degree of skepticism that we should apply to this that's far more serious than something that a jury would decide, because we know juries are neutral and insurance companies are not. Nevertheless, the Glenn case teaches us that, especially where there's no structural conflict, and there is not in this case, everybody agrees with that, there's not much need to move the needle. The only place where there's any degree of skepticism at all is with Dr. Bowman, because Dr. Bowman, for whatever reason, is retained by Aetna for quite frequently. In the Nolan case, this court said that certainly the district judge needs to consider that, the fact that somebody has, and the district judge can't ignore that. You'll find at page nine of the record, literally the final paragraph of the district court's order, just before the conclusion, the court says that, I don't see much here with Dr. Bowman, but we did consider that evidence in applying the standard of review, so I think the district court did exactly what Nolan teaches it that it's supposed to do. Namely, consider the fact that Dr. Bowman has some amount of, some question marks associated with her. Nolan says you can still decide this on summary judgment, though, and so I think it was proper for the district court to say that, given that Bowman was an internal medicine doctor, and given that, just like in this case, internal medicine isn't necessarily a driver of disability, the fact that there are a lot of denials doesn't necessarily mean bias. It could mean something else. Forgive me, but I do have one more question. Absolutely, Your Honor. I should have asked it earlier. I did ask earlier whether the plan says we use the dictionary of occupational titles, and I think you answered that question. In fact, though, I have a remaining issue about whether the plan administrator looked to the definition of sedentary in the dictionary of occupational titles and assessed his current job against that, or whether they looked at another job description and said the job Mr. Rood has is closest to job X. It seems to me in one place they seem to do one, and one place they seem to do the other. Give me one second, and I'll find that in my outline, Your Honor. At pages 170, 179, and 447, you will see that in addition to asking the supervisor for information, that Mr. Rood was asked to complete an eight-page questionnaire to help understand what his position consisted of, and in addition to that, there was the review of the dictionary definition. So it was the supervisor, the eight-page questionnaire to Mr. Rood, and then also consulting the Department of Labor's definitions. So it's the definition of sedentary as opposed to the definition of a comparable job title? In all fairness, I don't think they approached it that way. I think they were trying to get at what exactly does your job entail? What are the requirements of your job? Yeah, but they have to assess that against something. So they figured out what his current job required, if you will, and then the question is, did they assess it against the sedentary definition or against a comparable job title definition? Is that the part you're not quite sure on? No, it's not that I'm not quite sure. I don't think they approached it that way. I don't think they were focused on phrases like sedentary versus light. I think they were focused on— Can you do your current job? And specifically, how many hours of standing is your job? How many hours of walking is your job? How much must you lift at your job? And then they measured that against the doctor's reports, which specifically analyzed the MRIs and gave conclusions about how many hours you can sit, stand, or walk. So I don't think the conclusion was, we're looking for sedentary, we're finding sedentary, or we're looking for sedentary versus light duty. I think it was, how many hours can this person do their job? How many hours—I'm sorry, how many hours can this person stand, walk, sit? And what are the MRIs say about how long can stand, walk, sit? Thank you. Okay. Thank you. Mr. Davis, back to you. I think you had about three minutes left. Thank you. To follow up on the line of questioning, I think there's a couple of important issues with regard to how they—how did they categorize Mr. Rude's job. And I think the court is—some of the questions were insightful that I believe that's part of the problem and one of the procedural violations that occurred is that they didn't consult with any vocational expert like Mr. Rude did to determine the impact of this travel and how often was the travel and did that change this job from being— But everything counsel just said makes sense to me if we're talking about, I think, if we're talking about whether he could do his current job. It's just that for long-term disability after 18 months, by definition, the plan isn't looking at his current job. Then it's really looking at the labor market, right? Right. But for those six months, though, it was the issue as to whether or not he could do his current job at Intel. And I think that's where they misclassified his job. They—they used a—really the Dictionary of Occupational Titles because it defines it as sedentary. But the Dictionary of Occupational Titles didn't factor in the travel. And there's no dispute that— Didn't what? I'm sorry. Did not factor in the need for Mr. Rude to travel in his Intel job. Does the—what's the record on that? I know the number of times a year he—was there any indication about whether it was international travel? Well, the only—the only indication that we have that it was international travel is the first time that he went to go see Dr. Fanto, his pain specialist. He talked about how he had—was traveling to Israel a few months prior and almost wound up in the hospital due to chronic pain. So that's— Sitting in the coach seat. I think it talks about that. Yeah, there's reference—yes. There's a reference in the functional capacity evaluation where he was having great difficulty because of his size. He's 6'5", 330 to 350. He was having a very difficult time traveling in coach. And then there's that record about traveling to Israel. But there isn't a representation that I could find in the record. It gets a little muddy. But I don't think the idea was that he could—or that he was required in his current job to require—to travel this frequently internationally. Is that right? I don't think he was—yeah, I agree. I don't think the record's clear on whether or not the one to two times a quarter—Mr. Rude told Mr. Dean, my vocational expert, that it was approximately once a month. Nobody ever called Mr. Rude to find out how often he really was traveling. But it's not clear whether or not all of that travel was international. If I could just address of the time remaining, I think the appropriate remedy here for the court to issue would be, I think, to pay and to find Mr.—not pay, but find Mr. Rude disabled for those six months. Find that he was unable to do his job. How much is in controversy? What's the amount in controversy? You know, I've never calculated it, Your Honor. I don't know. For six months? Yeah, I don't know. I don't know what that amount is. How much it is per month? No, I don't. Well, he was making $90,000 a year and presumably would have gotten about 60 percent of that, minus the Social Security. That would be 90 percent of—how much did you say? Well, he was making about $90,000 a year. But he wouldn't have gotten all of it. Times six months. Yeah, times 60 percent of that, typically. And they're going to get an offset for the Social Security. Correct. Right. And then order that they review the claim to determine whether or not he meets the next definition of disability, the any occupation definition of disability. I think that's the most reasonable resolution in this case. Mr. Nadel says HAMA versus Intel basically is on point. Social Security is not relevant in that Intel plan. Well, I respectfully disagree with Mr. Nadel on that issue, and here's why. Once Aetna found on the final denial that there were, in fact, objective medical findings, once Mr. Rood was over that hurdle, then it became a question of functionality. What was he able to do? What was he not able to do? That's where the FCE, the plan allowed him to corroborate those objective findings with the FCE, which I haven't really addressed, but really was dismissed. And that's where I think the Social Security finding comes into play, Your Honor, because I think that is what an independent agency found that he was unable to not only do his prior job, but any job. For us to rule for you, we would have to find that the plan administrator abused its discretion because, and then fill in the blank, because what did they do? Well, a number of reasons. I think they misconstrued the plan's terms with regard to objective medical findings on the initial denial. I think they selectively reviewed Mr. Rood's evidence and minimized it. They misclassified his job. They didn't explain at all what weight they gave to Dr. Katz's opinion about he'd have difficulty working. They failed to consider the Social Security decision. It would have been easy for them to do so. I mean, even if we assumed that they did issue the decision on February 3rd, they had the decision that day. How difficult would it have been for them to simply look at it and tell me that they were going to take additional time to consider the Social Security? I would have agreed to that with no issue. There's many things that they could have done, and because they didn't, they abused their discretion, and that's why I think he's entitled to these benefits. Thank you. Thank you. Giselle, thank you as well. The case just argued is submitted.
judges: Duffy, Silverman, Christen